The first case I'm going to talk about this morning is 516-010, I'm sorry, 516-0140, the estate of Frederick Boyd. Mr. Johnson, are you ready to begin? I am. Before you, I'm sorry, are you ready to begin? I am. You can come up. Justice Chapman reminded me that we are missing Justice Moore today. He was under the weather earlier this week, but he also won his election last night, so for whatever reason, he's not with us today. He was probably up late. But regardless, as you know, the oral arguments are recorded, so he has been assigned this case and will be the third panel member and will listen to the recordings. So if you have something to say that, you know, you really want to get out, do it so he can hear it. Okay? Mr. Johnson, you may proceed when ready. Thank you, Your Honors. Mr. Forth, as you know, I represent Helen Brian Boyd, who is the only child of, only heir of, and administrator of the estate of Frederick Boyd, deceased. We are asking that this court reverse the trial court entered on March 5th, 2016. It's our position that Tyne Laura Aker, who's the affiliate who was the dominant party in the fiduciary relationship with the deceased Frederick Boyd, she was named beneficiary of Frederick Boyd's MetLife Life Insurance Policy. She was named beneficiary of Frederick Boyd's Jackson National Life Life Insurance Policy, and she was named as joint owner with Frederick's of a Bank of America checking account, which she later deposited a check made payable to Frederick Boyd in the amount of $49,000 into this joint account. It's our position that these assets belong to the estate, pursuant to our citation, and not to Laura Lankford. A large portion of my brief focuses on explaining why Ms. Lankford was the dominant party in the fiduciary relationship with Frederick Boyd at the time these transactions took place. But Ms. Lankford has now conceded that point. Which point? The point that they had a fiduciary relationship, and I'm assuming they're also conceding the fact that these transactions all took place during the period of time that this fiduciary relationship was in existence. I have a few questions I would like you to clarify, if you can. On October 8, 2015, do you know who appeared, or if somebody appeared, before the court asking to grant the motion to reconsider and setting aside the dismissal? No idea. I was not involved at that point. I think Mr. Boyd was pro se at that point, and I think he appeared pro se at that point. But there's nothing in the record that indicates that, nothing in the briefs? Yeah, I don't know. It's very strange. I got involved after that, and I know that there was some pleading. I find it odd that Judge McGlynn would hear from just somebody walking into his courtroom, you know, like you suggest. Also, there seems to be an order missing. Agreed. There seems to be an order missing. And I've never seen it. I don't have it. And I think, from what I can tell from the record, Mr. Boyd, Brian Boyd's attorney, filed a motion to withdraw. While that motion to withdraw was pending, I think Mr. Forth appeared at a hearing that was previously set on his motion to dismiss. That was heard, because the attorney that was withdrawing didn't show up. The claim, the citation was dismissed, and then I guess Mr. Boyd filed a pro se motion. It did look like he had help. It doesn't look like it. That's what the briefs suggested. It sure looks like it to me. I wasn't involved. I didn't get involved. All of that happened. I got the file from, I didn't even get the file from the previous attorney. Went to the courthouse, got the court file. Well, the missing order, did you make any inquiry as to how or why or what? I didn't think it was real relevant at that point. And Judge McGlynn never brought it up. I didn't know how that was relevant to the citation. That all seemed to be more procedural to me than anything. There was some back and forth with orders getting dismissed and, I mean, petitions getting dismissed and orders being vacated. But I'll be honest with you, I didn't focus too much on it. I just was focusing on the substantive issues, the citation and whether these assets were assets of the estate. I just was not involved with any of that stuff. So I'm sort of as in the dark as you. Well, it would be exceptionally relevant if there were any findings that were contained in there. But for right now, I guess we go on as is. All right. So at this point, under Edelman law, because they conceded the fiduciary relationship, because they conceded that these transactions took place during the period of the fiduciary relationship, the transactions, these transactions are presumed fraudulent under Illinois law. So the only issue before this court is whether or not Lankford proved by clear and convincing evidence that these transactions were fair, equitable, and did not result from Ms. Lankford's undue influence over deceit. And that is the law of the Supreme Court in the Franciscan Sisters case has held that. That's also been recognized by this court in the state of Miller. But that's not disputed, is it? That's not disputed. Now, the fiduciary burden was not on Brian Boyd. Not only is the burden not on him, it was on Laura Lankford. It was on her to prove this by clear and convincing evidence. Clear and convincing evidence in Illinois means that she was required to present evidence which leaves no reasonable doubt in the mind of the fact finder that these transactions were fair and equitable. And there's certainly a load of reasonable doubt here. She simply did not meet this clear and convincing evidence burden. And that's what I'd like you to explain. Okay. So the first one thing that this court cannot overlook is that she was the only witness who testified on her behalf. There wasn't one independent witness. There wasn't a friend of Brian's. There wasn't a friend of Frederick's. There wasn't a friend of hers. She was the only witness that testified. Where did your client live, though? He lived out of state at the time. It was somewhere pretty far away. He didn't make a lot of visits. Didn't make a lot of visits, did stay in contact with his father, and Judge McGlynn did find that he did have a loving father-son relationship up until the time of his death. So I don't think that that was an issue. But it may account for the lack of witnesses. I mean, there weren't a lot of people surrounding him, didn't seem like. It was her. I know. She was the caregiver. Well, that's what's curious about this whole thing. I mean, it was her and him. She had the – there was no need to verify what happened because she was the only one present besides Mr. Boyd, who's deceased. The only other testimony that they had were these two letters from Dr. Stein, who was Mr. Boyd's physician. I objected to these letters at the hearing. There was no foundation laid for them. They were hearsay. They were admitted over my direction, and they should not have been. So the only person who testified, like I said, was oral. The only person that was present, the only person that had the control of the situation. Not one independent witness testified. And presuming that that is the only admissible evidence, are you saying that there is no way that could have carried the day? I'm sorry. Her testimony. Absolutely. Even with the doctor's affidavits or the doctor's letters, she didn't need a verdict. There's three factors that the court has said that – three significant factors that are relevant to determining whether people in oral disposition have overcome the presumption. A showing that the fiduciary made a frank disclosure. Never once did she testify that she made a frank disclosure to the decedent. The fiduciary paid a fair value for the property that she obtained. I guess their argument is, well, she cared for him, and maybe that's the fair value. But she never argued that she actually paid fair value for any of this stuff. And the fiduciary proves that the principal received competent and independent advice. Or testified that Mr. Boyd was in bad, bad shape. He had a stroke in 1988 that impaired his left side. In August of 2005, it appeared that he was attacked in his home. He had a stroke at that time, too. He's unable to walk without assistance. He's unable to bathe himself. He's unable to dress himself. He's unable to cook for himself. He's unable to drive. He's unable to go to the store and get his prescriptions. The court took care of him after that point. And she said it was like you had to take care of a child. So she's carrying – he can't do anything on his own. During that period of time, she goes to Bank of America. She opens an account for him, a joint account with him, signs a signature card there, takes it back to him. He signs it. She takes it back to the bank. Did he actually sign it? I mean, his – There are no – Didn't preclude him from doing that? We're not – It doesn't sound like an act. There's no evidence that he didn't sign it. Okay. But all of his monthly checks go into that account. And how about his mental facilities at the time that he signed that? There was – I'm sorry. What was that? Faculties. Faculties. I don't know. She didn't testify. Remember, the burden's on her to testify. But nobody asked him whether he was – And she never testified to it. And there was no testimony from the Sons that there was any – There was not. – inconfidency or claim of – There was not. We do know in July 2010, he did get worse. He contracted C. diff, had emergency surgery. She testified that he could not live alone after that. And she moved in with him to take care of him. And then that was in July 2010. And then just days later, on July 7, 2010, she arranges to change the beneficiary of his two life insurance policies. She calls the insurance companies. She gets the change of beneficiary forms. She fills her name in as the beneficiary. She gets him to sign it, and she sends it back to the insurance companies. Again – Now, at that point in time, is there any discussion as to his mental capabilities? There is not. And the Son didn't testify? Yeah, he didn't testify. Regarding that matter? That's correct. But, again, burden is not on Son. Burden is on Ms. Langford. I understand. But that would be one issue that's relevant. With her family. That record is going to be silent as to that, right? It appears so, yeah. Yes. But there's no evidence that during the time he signed these, that anybody that she ever made a frank disclosure to him as to what she was doing, no evidence that he ever received any independent advice. By all accounts, it was just her and him, Mr. Boyd and Ms. Langford, at the time that these change of beneficiary forms were signed. The UnitedHealthcare check, there is some testimony about his mental faculties at that time. This happened on September 18, 2012. Ora testified that just prior to that, he had suffered another recent stroke, which affected his cognition. He was unable to speak and he was on a feeding tube at that point. A check is sent to his house. Ora, who's living with him, takes control of the check. It's a $49,288.13 check made payable to Mr. Boyd, not made payable to her. She takes it. She doesn't even have him endorse it. She takes it straight to the bank and deposits it into this joint account, the account that she'd opened on her own. Do you think that factor is relevant in showing that as part of her burden, of clear and convincing that she was not abusing her beneficiary relationship? I mean, she could have cashed the check on her own, absconded with the money or put it in a separate account. She chooses to put it in the joint account. And leaves it in there for the most part until he passes away. I mean, she could have started her own account, but didn't. Well, in effect, it was her own account because it was in her name. And she ended up with money regardless of when. I'm sorry. Again, the three factors that she needs to prove in order to meet this clear and convincing evidence standard, there was no evidence of a frank disclosure of Mr. Boyd. There's no evidence that he didn't even endorse the check. And there's no evidence that Mr. Boyd ever received any independent, competent advice regarding this check. Now, one of the other things that intrigued me is, you know, everybody has to sign these powers of attorney when they go into these health care facilities, hospital, long-term care, which he obviously was placed into. But when he was put into the Barnes-Jewish Extended Care Program, he executed a durable power of attorney to Ora, naming Ora as his agent. Correct. Do you think that's a relevant factor in her overcoming this presumption? I mean, he was outside with nurses, I presume. I presume there's a witness on that. There is, and the witness didn't testify. But it nevertheless reflects a witness, right? Again, we know very little about it. We know that, and I think Ora testified, that he didn't receive any independent, competent advice like a fiduciary is supposed to do in these situations. And, yes, I think it makes her more and more difficult because it shows that she was his fiduciary. When people come into my office and want to do a power of attorney or want to be named a power of attorney, I tell them, look, from here on out, you are held to a super high standard of care. You can't just be transferring money back and forth. You can't take your mother or your father's money and do with it what you want. You have got to have witnesses. You've got to have a paper trail. She had none of this stuff. And that's the reason that it's so easy in people, people in the worst situation, it's so easy for them to take advantage of the situation. It's so easy for them to open joint bank accounts. It's so easy for them to cash checks. It's so easy for them to change beneficiaries because Mr. Boyd didn't, he was completely reliant on her. That's the reason that the Owen Law places this high, high burden on people in the worst position. But there wasn't the situation where she was hired as a caretaker and came in and was paid and then presumably took advantage. They had a 40-year relationship, and 25 of it was when he was disabled. Doesn't that give some indication that there was a motivation beyond her wanting to take advantage of... Some indication, yeah, but not clear and convincing. Her, her, her, the burden is high. There's a clear and convincing standard for a reason. And it's because, again, it's so easy to take advantage. We have no idea what Frederick Boyd wanted at this point. None. She didn't testify to it. No independent witness testified to it. We have no idea what he wanted. Well, she did testify to it. Didn't she say it was his intention and request that these changes were made? I objected, and I think that my objections were sustained based on what I had said. Okay, well, I guess we'll see in the record. While Justice Chapman's doing that, I had a follow-up question to this 40-year relationship. Your client was aware of Ora's relationship with his dad, right? He was. At what point did he begin becoming concerned about the relationship? When dad died or... Yeah, I'm not sure he was aware, and I don't know if the record shows it, if he's exactly aware of what's going on or not. But he made no effort to find out. I'm assuming that if he... Again, it's not on the record, but I guess if he would have known that she was taking a $49,000 check and being available to her dad and putting it in a check account with both of their names, yeah, he would have been concerned. No, but my point is he had to have known that his dad had bills that needed to be paid and that someone was paying them. And for at least some period of time, his dad... I mean, his strokes got worse, obviously, but at some point in time his dad could sign his name and write a check, and your client never looked into that, had no testimony to offer on that? He had no reason to be concerned until he saw what happened after his dad passed away. After death. Okay, that's when the concern arose. After he found out what she was doing or what had been done. Okay, thank you. The case, the Staley-Miller case, which is a 5th District case, which I cited in my brief but didn't go into too much detail. The facts of that case are very similar to this case. In that case, a gentleman, Lewis Miller, in his 80s, he appoints his daughter, Emma Ford, his agent under a power of attorney. She uses the power of attorney to cash in some CDs. She uses the power of attorney to add her name to a joint bank account, just like Ora did here. Lewis dies. Just like here, the administrator files a citation against Emma to recover the money that she took. The difference is, in that case, the trial court said she did not meet her burden, and the court ruled that she returned the funds to the estate. Emma appealed, and on appeal, Emma's arguing the same things that Ms. Laker is arguing here. We had a really close relationship. My dad loved me, or my brother loved me. He was confident at the time of these transactions. He knew what he was doing, and that the estate never presented any testimony that Lewis didn't say he didn't want this to happen. And the court rejected all of those arguments and said the burden was on Emma. The burden is not on the estate. The court in that case also discredited her testimony because of the self-serving. Was there a will in Miller? You know, but I don't recall that. Because one of the reasons that people do set up joint accounts and beneficiaries is to take outside, be able to transfer outside of the estate, and there was no will here, so it does not appear that he intended to transfer his estate to his son. Interestingly, in Miller, the attorney for the decedent testified for Emma and said, yeah, you know, I knew Lewis for a long time. I consulted with him, and really I think this is probably what he would have wanted. He would have wanted his sister to have this. And the appellate court rejected it. The appellate court wasn't persuaded by the attorney's testimony because the attorney didn't focus on those three factors he was supposed to focus on. He didn't indicate that there was ever full and frank disclosure. He didn't focus on the fact that he ever gave Lewis any independent advice about this stuff. So, you know, it's interesting. In that case, they had even more. They had a witness. Not only an independent witness, but the decedent's attorney testified, and the court was not impressed or persuaded by his testimony. I just think that the trial court didn't apply the right law. The trial court, and if you look at his opinion, he looked at this as the same question you're asking. These people had a loving relationship. He took care of them for a long time. You know, I really think that she deserved this. But that's not the standard. Well, you also, in your brief, argued that he applied the statutory custodial right. Yeah, he didn't necessarily apply it. When I read the actual statement of the judge, he did not. But it doesn't make any sense. That's not the standard. That statute is not applicable at all in this situation. I appreciate that. And I think that's exactly what the judge said, is it was not applicable. So why would he even – It was an aside, apparently. Mr. Johnson, you'll have time for rebuttal. Thank you very much. Unless Mr. Chapman has a point. No, I don't.  All right. Let's hear from Mr. Forth. Good morning, Your Honor. Good morning. And before you begin, have you been in this case since the beginning? I came into the case after, I believe, Ms. Lankford was on attorney number two. I'm not sorry. I'm sorry. Mr. Boyd was on attorney number two. And so I had not been involved initially when the case was initially filed. But attorney number two – So you were involved in August of 2015. I believe that's correct. So do you know who granted the motion to dismiss that was disappeared from the court file? I do not. And I raised that in my reply brief because it was an absolute mystery. And I never was able to get an explanation from anyone. And I frankly could not believe that Judge McGlynn, that someone would show a pro se in his court and walk in or walk back to his chambers on a day that was not a scheduled court appearance and would be able to obtain an order setting aside because – That's okay. We can check with the clerk. Yeah, it's just very frustrating. So I never got an answer. I'm sorry. I do want to ask you one more question, then I'll let you proceed. And the entry of the order without notice of hearing, it appeared to be lawyer drafted or at least he had some assistance in October of 2015, which you would have been involved then. Did you prepare that? Oh, no, absolutely not. Did anyone from your office? No, absolutely not. As a matter of fact, I inquired with his counsel who had just withdrawn a month earlier. I said, did you draft that? I called him and I said, did you draft that after you withdrew from the case and did you go in and present that to the court? Because I suspected that he had and he never returned my phone calls. And everybody suspected that because – or suspected there was an attorney involved just because of the way it was drafted? Is that correct? Correct. It's clearly not pro se pleading. Okay. Go ahead. I'm sorry to have interrupted you. No, my pleasure, Your Honor. Those questions were kind of nagging me. You and me both, Your Honor. Go ahead. I don't want you to take any more time than mine. Sure. Well, may it please the Court and Mr. Johnson, this case, as the Court has noted and as the record reflects, I frankly was stunned when this appeal was filed and I bluntly asked Mr. Johnson, I said, were you and I sitting in the same courtroom? Because it could not have been more clear from the testimony presented by my client. And it was absolutely compelling testimony. As noted in Judge McGlynn's ultimate judgment, you know, it's not often that judges write, I've had some tough cases as a judge. This isn't one of them. But I think what Mr. Johnson is saying is basically her testimony wasn't enough, alone, and especially if you take out the doctor's letters. I understand that. And there's maybe some fundamental confusion on the issue of the burden of proof here. So, first of all, in reviewing the case, this Honorable Court must defer to the trial court unless this Court finds that the Court's judgment was clearly against the manifest way to the evidence in that case. So, first of all, the Court should defer to the trial court. Secondly, though, in applying the standard with regard to clear and convincing evidence when the trial court was reviewing this case, we can see, as I've set forth in our brief, that we have the initial burden of proof, that there was a presumption of undue influence because of the existence of the fiduciary relationship. We admit that. However, what that does is the defendant then had to come forward and present evidence to rebut that presumption. Once the defendant had presented evidence to rebut the presumption, the burden shifts back on the plaintiff to offer evidence that there actually was undue influence. In this case, there was no evidence or testimony of any kind of actual undue influence from my client. It's strictly based upon this presumption that she was in a fiduciary relationship with him, which she rebutted with her own exhaustive testimony, which the Court found very compelling. So, first of all, that's a key issue with regard to the burden of proof. But secondly, and I want to maybe jump for a minute, the Court raised a number of questions with regard to testimony or claims involving the deceased, his competency. And there was absolutely no testimony at no time that Mr. Boyd was ever incompetent, that he was ever mentally incompetent, that he was declared incompetent. There was no assertion of that. And contrary to what was stated earlier, we cited at the bottom of page 8 of our brief, I asked Brian Boyd, I said, we discussed the status of his weakened physical or mental condition, and I asked Mr. Boyd as to whether or not he was aware that the powers of attorney were entered into. And he was aware. He knew that Ora was taking care of his father. He knew that she had powers of attorney. And I asked him if he ever objected to that. And he said, that was my father. That was my father's wishes. I didn't argue with my father. So he knew. He knew her status, and he knew what she was doing. He knew she was his sole caregiver. And knowing all of those things, he sat on his hands. Why did he do that? Because Ora was taking extensive care of his father for 30 years without any compensation whatsoever. And as part of it, I think the shocking nature and maybe the compelling nature of her testimony is that she never in all those years took a penny from him. She never asked for anything. She never took anything from him. She didn't do any of that. And in fact, as the court rightfully noted, even upon receiving that check, she didn't take that check. She put it in a joint account because she said, he's still alive. That's his money. And she didn't, during all of that period of time, after depositing that check, she testified that she never took any money out of that account for herself and only removed the funds from that account after he passed away because she said, okay, now that's my money. And that's the way he wanted it. And she testified. She asked him during the process involving the change of beneficiaries' life insurance policies, she asked him, she said, Fred, are you sure you want to do this? And he said, yes, I do. And they made the change. And she raised the issue of, you know, it's your son. You only got a son, and it was still his decision to do it. Now, I want to note it's kind of – it goes by the wayside of the three accounts that we're talking about. We're talking about two insurance policies, and we're talking about a bank account. The one insurance policy, Ora used completely to pay for his funeral. And she didn't even take that money. She used it to pay his bills and to pay his funeral. She didn't take that money for herself and run away with it. She assigned it, didn't she? Correct. For the entire check. Correct. And so in every circumstance, she's clearly demonstrating that she's an honest woman, that she's doing the right thing both by Fred and by his estate in what she was doing with the money. And all of this was driven by love on her part because in order to believe that she had some nefarious purpose, you would actually have to believe that for 35 or 40 years she schemed and cared for this man on a daily basis in the hope that eventually he would get a surprise check, which no one expected, nobody saw coming, and that she would then have an opportunity after he died to take that check for herself. It just – it's strange rationality. What was the big chunk of money, the United – what was that check all about? You know, I'll be honest. I don't know that we've ever gotten a clear understanding as to what the check was for. Because I was wondering if that was something that was anticipated. No, and I think her testimony was that it was unexpected because I think she even said she called to find out she thought it was a mistake. Nobody ever really – I don't know that they got an adequate explanation as to what those funds were for because I think it was surprise money that came in. The request for change of beneficiary form, though, for the America Life Insurance Company, life insurance, he actually would have had to have signed that, correct? I believe that's the case, Your Honor. She – I mean, it's not like she changed it somewhere in the dark of night. He had to fill out a form, or she filled it out, and he signed it so that you could get the request to change beneficiary form. And, Your Honor, and I will apologize as I stand here. I don't recall the specific facts of that. However, even if she had used the power of attorney, which she had at the time, even if she had done that, acting as his power of attorney, I think the testimony from her was that he knew about it and agreed to it. Well, I'm reading from the appellant's brief where they allege that happened, so I guess you can concede that one. I'll concede that one, Your Honor. Okay. Okay. The – in discussing whether or not she did meet that initial burden of proof, the court has stated that some of the factors to be considered are that there was a frank disclosure, that there was adequate consideration, that there was competent or independent advice. However, the court has stated that this is done on a case-by-case basis. You have to weigh the evidence and weigh the facts that are presented to you as to whether or not these various elements have been met. And in this case, what was clearly established by a word in her testimony was that she was frank. She was always frank with him, with the deceased, that everything was open. She never took any money from him, that certainly there was adequate consideration, which, as the court, again, rightfully noted, that reference that Judge McLuhan made in his judgment with regard to the statute, that clearly was not an intent to apply that statute. And again, the court – as the court knows, having sat on the bench for extensive periods, it's difficult to ascertain what the nature of the testimony was just from reading the transcript. But Judge McLuhan was trying to make a point to Brian Boyd. He was trying to say, Mr. Boyd, you should be appreciative of what you got and what your dad received for all of these years. You got a bargain, Mr. Boyd, because the statute would have given you – would potentially have given all of these sums. And in the end, you got off with only $60,000. That's all it cost. And off the record afterward, the court said, Mr. Boyd, I can only hope that someday, if I need this assistance, I will have the same. I can only hope to be so lucky. And so the entire purpose was not to apply that statute, but was to attempt to impute some common sense on Mr. Boyd, which then made it all the more frustrating to find out that Mr. Boyd filed this appeal because that really was what the court was trying to tell him. And obviously, the very fact that they would raise that argument demonstrates the fundamental weakness of their appeal in this case. What about the doctor's letters? The doctor's letters, first of all, the objection that was made with regard to the doctor's letters was a hearsay objection. There was not an objection to foundation. And the foundational issues were never preserved for appeal. The only thing preserved for appeal was the issue concerning whether or not they were hearsay. We will address that, then, if you would. Yes, absolutely, Your Honor. I've addressed each of these statements or each of these letters was not hearsay, either under 8033, 8034, or 80321. 8033 is mental, emotional, physical condition. The first letter related to a request to get Ora out of jury duty so that she could care for him, and it was the doctor giving a letter to her to help her get out of jury duty. So he discussed the physical condition of Mr. Boyd and his diagnosis, the treatment that's necessary for Mr. Boyd, and how Ora was necessary to that, and he could not go without her for a number of days while she was on jury duty. So why is that an exception to the hearsay rule? Because under either 8033, it relates to the mental, emotional, or physical condition, or it was given for purposes of diagnosis or treatment. If that's relevant, then how is it relevant to the lawsuit? It's relevant because, well, let me take a step back. It had minimal relevance. I will concede that. It had minimal relevance and, obviously, minimal weight, which is what I think the court attributed to it. It's a minimal amount of weight that was given because it showed his physical condition. It supported the testimony of Ora, who discussed at length his physical condition. To be honest with you, there was really no dispute about that. None of the parties really dispute the nature of his physical condition. So on that point, it was of minimal significance, but it did demonstrate the service that she was providing in requesting that she be relieved from jury duty, which, again, she had testified to that herself. So I would say it was minimally relevant and minimally persuasive. The second letter was more important, and I thought it was a very unique letter, which is a letter from a physician basically just saying, I'm really sorry for your loss because I know how much you cared about him, and I know the care you gave him for so long, and I think you extended his life by five years at least. And why is that not hearsay? That's not hearsay because it's doing nothing but expressing appreciation of her character, and that's not hearsay under 80321 as merely reputation as a character in the community. Again, not an extreme amount of weight. So what I would assert is they were both relevant. They were both not hearsay, so they were admissible from a hearsay perspective. However, regardless of that, their admission was harmless error at the very least because there was no fundamental fact of the case that was being determined based upon those letters. It was strictly a statement of reputation or opinion as to her character from Mr. Boyd's treating physician. So in the end, any weight that was afforded to that, I mean, it's a judge-tried case, obviously not a jury-tried case, so it's a judge-tried case, and the court gave it the weight and credibility that each of those letters deserved. Let me ask you this. Have you found any case law where the court was in the position we are in, that is there's nobody to testify except the caregiver? I'll be honest, Your Honor. I have not, and I looked at a number of cases, and I did not come across one that was directly similar to this. I mean, there are many caregiver cases. Usually there's a witness or something like that. Right. There's usually a witness, or I think usually the facts are very obvious, where you have somebody who comes in in the latter days of a person's life and sneaks in and, you know, takes the inheritance of the children or something, and I'll concede that the law books are filled with cases like that. Or you have neighbors or friends who come in and can testify that Ora was a great gal, she wasn't taking advantage of them, she kept them clean and whatever. Right? I mean, those are the kinds of cases we're looking at. And presumably there were friends like that. Obviously he was housebound, so they weren't getting out a lot. So I guess my question is, and this is what Mr. Johnson is getting to, is if you exclude the letters, do you think that one person, that is, the caregiver, can overcome the presumption by clear and convincing evidence when there's nobody else to testify to become an attorney? I'm sorry, Your Honor. I would say absolutely yes, depending on the nature of their testimony. So, and again, it's up to the court, as the trial is back, to assess their credibility and the things that they have to say. And I think a lot of times you can see through what a person is saying. And again, I think if she came in and got a power of attorney from him, and, you know, she just met him in 2010 and got a power of attorney and then changed the bank account, then I think the court would have given a different degree of credibility and weight to her testimony. And I think we'd be sitting here with a whole different scenario. But in this case, the testimony spanned four decades of love, and there was no dispute of that for Mr. Roy. He was living in Atlanta at the time and knew she was caring for him. He knew the nature of their relationship and never objected to it. In fact, as I stated before, knew about power of attorney and didn't object to it. So he knew the nature of the relationship. And again, it's a very unique case because of the duration of time that transpired. And I think it was very persuasive that clearly she had not used undue influence in order to obtain these funds. How did she survive? What was her testimony? I mean, did she have a check coming in? She had to buy clothing. She had to buy food. She did. They had originally met in the mid-'70s working on the public school system, and that's where they first met and started their relationship. And so she ultimately had retired from the public school system as a teacher. So did she have a teacher retirement check coming in? Yes, she did, and that's what she was doing. She didn't mingle that with the decedent's money? She did not. No, she kept him in separate residence for most of their lives until it was necessary that he needed more extensive care. But otherwise, she maintained completely separate accounts, residences. It's a unique relationship they had. But to address your question, though, that you raised, Your Honor, one of the questions I did ask Ora was whether or not she had done anything to alienate him from family, friends, et cetera. And she stated no, she never had. In fact, she had encouraged the relationship with his son and with his friends and tried to facilitate that. Okay. We have to stop you there. I'm sorry. Thank you very much for your comments. Thank you, Your Honor. Mr. Johnson, do you have your bottle? Yes, Your Honor. Thank you. Just briefly, with regard to the letters, they weren't introduced for those non-hearsay purposes. They were clearly introduced to attempt to admit as substantive evidence Dr. Stein's statements as to Ora's relationship with Mr. Boyd. And that was their defense the whole time, that they had a loving relationship that she took care of. Those are not defenses. I encourage you to look at the Miller case again. The facts are so similar. They used the same arguments, and they were just rejected by this court. Judge McGlynn's statement that this is not a tough case. Well, it wasn't a tough case for him because he didn't apply the law. He didn't look at the factors, the three factors that courts are required to look at that Oral Eggman did not bring up in her testimony, presented no evidence for, Judge McGlynn didn't look at. Again, he ruled on this case based on, I think that she took care of him for a long time, and if she was his wife, she would have gotten some money under the Statutory Custodial Claim Act. If she were a caretaker and not in a relationship, certainly she would have been compensated for her work all those years, correct? Yes, but again, that's not the standard. If she had a contract with him, or she had an agreement with him, where she was going to get paid for taking care of him, absolutely. But this rule has been codified now, as I'm sure you're aware, that caregivers who benefit from transactions with the person they're taking care of, again, presumed fraudulent. This is a very sensitive area in Illinois, and they've codified the statute. So, yes, she would have been compensated. You're asking us to enter an order or ruling that basically holds that when there's only one witness, and that is the caregiver, who is automatically presumed to have fraudulently entered into these transactions, that the testimony of the caregiver alone cannot overcome that presumption. In this case. In this case, there would be nothing. In this case, I'm asking generally, the only person we have is the caregiver, and what I hear you saying is the caregiver can't overcome that presumption. So what else is there that you can tell me that would allow, under what circumstances would you allow one person to overcome that presumption? Because it seems to me that if one person, that is the caregiver, can't give the testimony sufficient to overcome the presumption, who would ever take on the responsibility of being a caregiver? Because you're right, it's a very serious responsibility under Illinois law. Right. So what other facts would you think could give us a clue? I don't know, but being a caregiver is one thing. Being a caregiver and then putting your name on a life insurance policy benefit, opening a joint account with the person you're taking care of, taking a check to the bank without having the person endorse it and deposit it into a joint account. Caregivers shouldn't be doing that. I mean, just because you're a caregiver, you're not exposing yourself. You go into the house, you take care of the person you're supposed to take care of, and you go home. You don't mess with the financial transactions. That's when you get into trouble. So that is part of your argument, then, is the fact that there were these transactions. Absolutely. And I think the law is clear as can be. The caregivers can't do that. If they want to do it, they need to prove by clear and convincing evidence that this is what the transactions were equitable, that the person you were taking care of received independent, confident advice regarding these transactions, and that he received fair value. Okay. Justice Chapman, do you have anything else? Nothing further. Thank you, Your Honor. Thank you, Mr. Johnson. Okay. This matter will be taken under advisement, and this position will be introduced.